**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | | |
|---|---|---|
| IN RE: MUNICIPAL PARKING SERVICES, INC. DPPA LITIGATION | ) ) ) ) | Case No.: 3:24-cv-320-TKW-HTC |
| | | CLASS ACTION |

## PLAINTIFFS CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Audrey Smiley ("Ms. Smiley"), Peggy Nelson ("Ms. Nelson"), and Christopher Williams ("Mr. Williams"), through their attorneys, bring this Class Action Complaint against Defendant Municipal Parking Services, Inc. ("MPS" or "Defendant"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and good faith belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys.

### INTRODUCTION

1.      This is a privacy class action lawsuit against Defendant MPS for knowingly obtaining and using statutorily protected private personal information—including names, addresses, and telephone numbers—that originated from states' departments of motor vehicles ("DMV") records, in violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721-2725 ("DPPA").

2.      Defendant MPS is a business that provides "automated parking enforcement" and collection services to owners and/or operators of parking lots and decks nationwide. MPS's technology and systems allow its customers to manage

and enforce their parking lots and decks (many of which are gateless and operate without a parking attendant) around the clock with cameras to ensure driver compliance. These cameras leverage License Plate Recognition ("LPR") technology. MPS's LPR technology allows its customers to identify alleged violators by their license plates. MPS then distributes parking tickets or "notices" to alleged violators demanding payment for expired or unauthorized parking in addition to a "ticket amount" that greatly exceeds the unpaid parking amount.

3. For example, Plaintiff Nelson received a Parking Ticket identifying an unpaid parking fee of $10 with a "Ticket Amount" of $105, which is 1050% higher than the parking fee. Plaintiff Williams received a Parking Ticket from MPS identifying an unpaid parking fee of $10 and a "Ticket Amount" of $65, which is 650% higher than the parking fee. Plaintiff Smiley received Parking Tickets from MPS identifying an unpaid parking fee of $24 and a "Ticket Amount" of $65, which is 270% higher than the parking fee.

4. MPS's "Parking Ticket" or "Late Notice" threatens alleged violators that they must pay MPS before a certain date to avoid additional unidentified penalties called the "Ticket Amount", thereby making the total amount due to MPS in some instances *five to eleven* times the amount of unpaid parking. MPS's "Notice" further threatens consumers that "TICKETS NOT PAID AFTER 60 DAYS WILL BE REFERRED TO COLLECTIONS. VIOLATOR'S VEHICLES ARE SUBJECT

TO BOOTING/TOWING." These threats are simply that: threats. There is no indication that MPS ever boots, tows, or refers violators to collections.

5. Upon information and belief, MPS has never initiated any legal action against an alleged violator in its efforts to collect on any "Parking Ticket" or "Late Notice" it has issued.

6. Essentially, MPS's system is intended to automate parking lots using sophisticated cameras and other technologies that capture the license plate information of every vehicle that enters and exits the lot. The system is designed to track how long vehicles stay in the parking lot and whether the driver of the vehicle paid for parking through a website or mobile application. In actuality, MPS created systems that are designed to intentionally confuse, deceive and charge unauthorize fines and fees to extract more revenue from consumers in addition to unpaid parking. The purpose of MPS's automated enforcement system is simple: save money and increase revenue for MPS and its clients, all at the cost of consumers' privacy.

7. MPS provides parking lot enforcement technology and services to customers in many states across the United States.

8. MPS also contracts with other parking management companies (MPS's "Partners") to act as their "enforcement and collections vendor," which includes

MPS[1] accessing DMV motor vehicle records on behalf of the Partners to send out collection "Notices," "Tickets," or "Citations" to persons who allegedly owe money for parking violations and other unidentified miscellaneous fees that MPS calls a "Ticket Amount."

9.      The parking lots operated by MPS and its Partners have no entrance gates, other physical barriers or attendants that would indicate that the lot private and monitored by cameras. Instead, signage is posted sporadically around the edges of the lots. There are no barriers, kiosks, or attendants to require payment at the exits, either.

10.      Unsurprisingly, many people—like Ms. Nelson—do not realize that the parking lots that were previously free are now paid lots being monitored by MPS or MPS's Partners.

11.      Mr. Williams was mistakenly told by the restaurant he was dining at that the MPS-operated parking lot was free for its patrons.

12.      Ms. Smiley was told by her employer that she could park in the MPS-operated parking lot while she was working.

13.      If a driver misses the posted signs regarding payment, is unsure how or where to pay, and leaves the unattended and ungated parking lot without paying,

---

[1] All references herein to actions and conduct by MPS also refer to and include the actions and conduct of any agents and contractors hired by MPS, including GovCIO, LLC.

MPS captures the vehicle's license plate information.

14.    MPS and/or its agents then illegally use the license plate information to obtain the vehicle owner's personal information from records originating from the DMV in order to mail harassing "Parking Ticket" or "Parking Ticket Late Notices" in an attempt to collect outrageous parking fees and extortionate "penalty" charges, which are not posted or otherwise disclosed at the parking lots or even listed on their website.

15.    For example, Ms. Nelson received a "ticket" from MPS totaling $115.00 for unknowingly parking in a lot operated or enforced by MPS for just 35 minutes.

16.    In other words, MPS and its Partners utilize MPS's LPR technology to capture the license plates of each vehicle that parks in lots operated by MPS and the driver either fails to pay or overstays their payment amount. MPS and/or its agents then knowingly and unlawfully obtain individuals' vehicle registration information from records originating from the DMV to attempt to extort exorbitant sums of money as payment for an alleged simple parking violation.

17.    MPS and/or its agents obtained—and continue to obtain—statutorily protected personal information including names, addresses, and telephone numbers of Plaintiffs and Class Members, from non-public motor vehicle records originating from the DMVs in violation of the DPPA.

5

18.     MPS and/or its agents then disclose that statutorily protected private personal information to a third-party mailing service, who uses the information to mail Plaintiffs and Class Members surprise bills they never agreed to pay—doubling, tripling, and even quadrupling the charges within weeks of the initial demand and threatening to send the bills to collection agencies or to boot or tow the vehicles if not paid immediately.

19.     The DPPA prohibits MPS and/or its agents from knowingly obtaining or using personal information—such as "name," "address," "telephone number" and other information that identifies individuals—from motor vehicle records, including information originating from the DMV.

20.     MPS and/or its agents knowingly and without express consent or authorization obtained, disclosed, and used such information of Plaintiffs and members of the Class in violation of the DPPA.

21.     MPS's entire business model is based on willfully and recklessly ignoring the privacy protections afforded by the DPPA so it can harass, threaten, and intimidate consumers into paying MPS (and MPS's Partners) inflated amounts of money for a simple, alleged parking violation.

22.     MPS has no lawful basis to assess a "Ticket Amount" and each of the "Parking Tickets," "Citations," or "Late Notices" sent to individuals constitutes an unlawful and unconscionable act.

23.     Plaintiffs seek, on behalf of themselves and each member of the proposed Class, statutory damages under the DPPA in the amount of $2,500 for each violation, reasonable attorney's fees and other litigation costs reasonably incurred, and such other equitable relief as the court determines appropriate, including injunctive relief in the form of a prohibition on Defendant obtaining, using, and/or disclosing protected personal information obtained from the DMV without a permissible purpose.

**PARTIES**

24.     Plaintiff Smiley is a natural person over the age of eighteen and a citizen of Florida, residing in Okaloosa County, Florida, where she intends to remain.

25.     Plaintiff Nelson is a natural person over the age of nineteen and a citizen of Alabama, residing in Birmingham, Alabama, where she intends to remain.

26.     Plaintiff Williams is a natural person over the age of nineteen and a citizen of Alabama, residing in Montgomery, Alabama, where he intends to remain.

27.     Defendant Municipal Parking Services, Inc. is a corporation organized under the laws of Minnesota with its principal place of business at 11305 Four Points Dr., Building 2, Suite 300, Austin, Texas 78726.

28.     Wherever reference in this Complaint is made to any act or transaction of Defendant, such allocations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of Defendant committed, knew of

performed, authorized, ratified and/or directed such act or transaction on behalf of Defendant while actively engaged in the scope of their duties.

## JURISDICTION & VENUE

29.     This Court has original jurisdiction over this civil action under the Class Action Fairness Act of 2005. The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and there is minimal diversity because the named Plaintiffs and certain members of the Class are citizens of a different state than Defendant, as required by 28 U.S.C. §1332(d)(2).

30.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the Driver's Privacy Protection Act, 18 U.S.C. § 2721-2725.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the alleged wrongful conduct and events giving rise to the claim occurred within this district, Plaintiff Smiley resides in this district, and MPS conducts substantial business in this judicial district. Defendant's contacts here are sufficient to subject it to personal jurisdiction.

## FACTUAL ALLEGATIONS

A. *History and Background of the DPPA*

32.     In 1994, Congress enacted the DPPA to protect the privacy and safety

8

of licensed drivers and to limit misuse of the private personal information contained in these DMV record systems. The DPPA imposes strict rules for collecting the personal information in driver records and provides for liability in cases where an entity improperly collects, discloses, uses or sells such records. *See generally* 18 U.S.C. § 2721, *et al.*

33. The DPPA safeguards drivers' personal information from disclosure by state DMVs or acquisition by a third party for any purpose other than the limited permissible purposes expressly delineated in the DPPA.

34. In creating special protections for data in this particular context, the DPPA responded to concerns over the personal information captured and retained by state motor vehicle records. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records; "[u]nlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and thus limit their access to personally identifiable information" in other records. *See* 140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); *ibid.* (statement of Rep. Moran).

35. Personal information protected by the DPPA "means **information that identifies an individual**," which may "include[e] an individual's photograph, social security number, driver identification number, **name**, **address** (but not the 5-digit

9

zip code), **telephone number**, and medical or disability information . . . ” that is obtained “in connection with a motor vehicle record.” 18 U.S.C. § 2725(3) (emphasis added); 18 U.S.C. § 2721(a)(1).

36.    “Motor vehicle record” is defined to include “any record that pertains to a motor vehicle operator’s permit, **motor vehicle title**, **motor vehicle registration**, or identification card issued by a department of motor vehicles[.]” 18 U.S.C. § 2725(1) (emphasis added).

37.    Further to 18 U.S.C. § 2724, “[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains.”

38.    The DPPA’s general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information. Those 14 permitted uses of DMV data are designed to “strik[e] a critical balance between an individual’s fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information.” 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran).

39.    Notably, the DPPA does not list or identify any specific prohibited uses; rather, it generally prohibits all uses except for the fourteen (14) permissible uses enumerated in 18 U.S.C. §2721(b).

40.     As detailed herein, none of the DPPA's permissible uses apply to Defendant's uses as alleged herein.

41.     Indeed, 18 U.S.C. §§ 2721(a) and 2722(a) make nondisclosure of personal information the default rule. *See* 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title."). 18 U.S.C. §2721(b) then lists the fourteen (14) discrete exceptions to non-disclosure, exceptions that, again, do not and cannot apply here.

42.     The DPPA creates a private right of action for "the individual" whose personal information was knowingly obtained, disclosed, or used "for a purpose not permitted" under 18 U.S.C. § 2721(b). *See* 18 U.S.C. § 2724(a); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title.").

**B. *Defendant Obtained, Used and Disclosed Personal Information in Violation of the DPPA***

43.     MPS is parking lot technology and enforcement company that uses its proprietary technology to automate parking enforcement and collect from supposed violators.

44.     MPS touts on their website that "[t]he MPS parking enforcement

11

technology platform is simple. We automate enforcement by providing enhancements to enforce, detect & collect. It's flexible and customizable to meet our client's ongoing needs while providing them with an economic model that works."[2]

45.   MPS's Partners—with whom it contracts as their enforcement and collections vendor—manage more than 1,000 parking lots across the country.

46.   MPS licenses or sells its proprietary LPR technology and software to its Partners, which allows its customers to monitor their parking lots via cameras and without any physical barriers or attendants.

47.   In order for MPS and its agents to send "tickets," "invoices," "notices" or "citations" to the any alleged "violators"—none of whom had provided MPS with their mailing address or written consent for MPS to obtain it—MPS collects the license plate information of drivers entering and exiting the lots and then MPS and its agents search for those plate numbers within vehicle registration databases consisting of information originating from state DMV offices.

48.   MPS does not shy away from the fact that it obtains and uses driver information from information originating from DMVs to send out its "notices" and "invoices."

49.   According to its own website, "***MPS can also perform DMV look***

---

[2] https://municipalparkingservices.com/solutions-lots-and-garages (last accessed September 27, 2024).

*ups[.]*"

50.     However, MPS removed this language from its website[3] since the original filing of this case, but a copy of the MPS web page being referenced was captured on July 9, 2024, and is attached as **Exhibit A**.

51.     The Invoices that MPS sent to Plaintiffs and Class Members instructs recipients to pay by check to MPS.

52.     MPS receives a share of the revenue from any payments received from alleged parking violators as a result of MPS's "enforcement" and collection services.

53.     To accomplish its parking enforcement and collection scheme, MPS obtained and misused driver records without Plaintiffs' consent and with no permissible purpose under the DPPA.

54.     Plaintiffs never provided their names or home addresses to Defendant.

55.     Plaintiffs never authorized Defendant to obtain their personal information from any motor vehicle record.

56.     MPS knowingly obtained and used Plaintiffs' personal information from records maintained by the DMV by cross referencing Plaintiffs' license plates with vehicle registration data that originated with and is maintained by the DMV. This occurred without Plaintiffs' express or written authorization or consent.

57.     Defendant's obtainment, disclosure, and/or use of personal information

---

[3] *Id.*

from Plaintiffs' motor vehicle records was not for any enumerated purpose.

58.   Defendant is not a government agency.

59.   Defendant was not acting on behalf of a Federal, State, or local agency in carrying out its functions when it obtained, disclosed, and used Plaintiffs' personal motor vehicle record information.

60.   Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities; or removal of non-owner records from the original owner records of motor vehicle manufacturers.

61.   Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information to verify the accuracy of personal information submitted by Plaintiffs to Defendant or Defendant's agents, employees, or contractors.

62.   Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, or the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

14

63.     Defendant did not intend to obtain, disclose, or use Plaintiffs' personal motor vehicle record information for potential use in future legal proceedings against Plaintiffs.

64.     Defendant obtained, disclosed, and used Plaintiffs' personal motor vehicle record information solely to send demand letters for payment to Plaintiffs' homes.

65.     Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in research activities, or for use in producing statistical reports.

66.     Defendant is not an insurer, insurance support organization, or by a self-insured entity, and was not acting in connection with claims investigation activities, antifraud activities, rating or underwriting when it obtained, disclosed, and/or used Plaintiff's personal motor vehicle record information.

67.     Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in providing notice to Plaintiffs that their vehicles had been towed or impounded.

68.     Defendant is not a licensed private investigative agency or licensed security service.

69.     Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information to obtain or verify information relating to a holder of a

commercial driver's license.

70. Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use in connection with the operation of private toll transportation facilities.

71. No state or motor vehicle department secured Plaintiffs' express consent or authorization to provide their personal motor vehicle record information to Defendant.

72. Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for bulk distribution for surveys, or marketing or solicitations.

73. Defendant did not obtain Plaintiffs' express or written consent or authorization to obtain, disclose, or use their personal motor vehicle record information.

74. Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use related to the public's safety.

75. Defendant did not obtain, disclose, or use Plaintiffs' personal motor vehicle record information for use related to the operation of Plaintiffs' motor vehicle. To the contrary, Defendant's obtainment, disclosure, and/or use Plaintiff's personal motor vehicle record information was related to the parking (i.e., non-operation) of Plaintiff's motor vehicle.

76.    No state statute authorized Defendant to use license plate readers and to obtain, disclose, or use Plaintiffs' personal motor vehicle record information without Plaintiffs' consent or authorization.

77.    After acquiring personal information that originated from the DMVs, Defendant and its agents impermissibly utilize the information to send parking notices or tickets to consumers' homes.

78.    Plaintiffs have never publicly disclosed or made publicly available the personal motor vehicle record information acquired by Defendant.

79.    Defendant knowingly obtained, disclosed, and/or used Plaintiffs' personal motor vehicle record information for a purpose not permitted under the DPPA.

80.    Defendant's conduct and DPPA violation caused Plaintiff and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff and the Class Members.

81.    The misconduct by MPS and its agents violated—and continues to violate—the DPPA and Defendant has harmed Plaintiffs and Class Members by (1) invading their privacy when obtaining their protected personal information from the DMV—including their names, home addresses, and telephone numbers—without their express consent and (2) by intruding upon their right to seclusion by sending

17

letters and other communications threatening them with collection actions. This conduct has caused—and will continue to cause—Plaintiffs and Class Members to experience distress, aggravation, and annoyance.

82. Upon information and belief, MPS and/or its agents continue to wrongfully retain the personal information of Plaintiffs and Class Members from their motor vehicle records, and Plaintiffs will be further injured by Defendant's future misuse and retention of their information.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Audrey Smiley*

83. Ms. Smiley is a victim of Defendant's scheme. MPS and its agents unlawfully identified her by obtaining her protected personal information from information originating from state motor vehicle records without her consent in order to surprise, harass, threaten and intimidate her with bills and fees for parking she never agreed to pay.

84. For approximately six weeks starting January of 2024, Ms. Smiley worked as a security officer at a location in Pensacola where the parking lot was managed by an MPS Partner. Her employer provided her with a parking pass so that she could park in the MPS lot without being charged personally.

85. She parked in the lot with her parking pass as instructed by her employer for roughly six weeks.

86.     There was a disconnect between the MPS Partner and Ms. Smiley's employer, and MPS and its agents still mailed Ms. Smiley approximately six "Parking Tickets" for alleged unpaid parking fees.

87.     The letters threatened that the ticket amount would increase every few weeks and that MPS would refer her to "collections" or tow/boot her vehicle if she did not pay.[4]

88.     The many letters MPS and its agents mailed to her home address included her name, home address, license plate number, the make of the motor vehicle, identified the parking lot as the location upon which she incurred the parking fines, and included pictures of the rear of her motor vehicle taken at the entrance of the parking lot that clearly displayed her license plate and license plate number.

89.     Ms. Smiley knew she was receiving these tickets in error, so she disputed them with MPS.

90.     MPS confirmed that it sent her the tickets based on the information gathered from its cameras and, despite requests from Ms. Smiley, MPS still refuses to void the invoices.

91.     Ms. Smiley neither provided Defendant with the personal information needed to identify her by name and address nor consented in writing to MPS or its agents accessing or obtaining her motor vehicle records.

---

[4] *See* **Exhibit B**.

92.     MPS's conduct towards Ms. Nelson was an intrusion upon her seclusion and an invasion of her privacy, and it caused her to experience distress, aggravation, and annoyance.

93.     Defendant harassed and invaded Plaintiff's privacy and solitude by obtaining, disclosing, and using Plaintiff's personal and private motor vehicle record information.

94.     Defendant harassed and invaded Plaintiff's privacy and solitude by disclosing Plaintiff's personal and private motor vehicle record information to Defendant's vendor(s) and/or agent(s).

95.     Defendant's conduct and DPPA violations caused Plaintiff and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff and the Class Members.

***Plaintiff Peggy Nelson***

96.     Ms. Nelson is a victim of Defendant's scheme. MPS and its agents unlawfully identified her by obtaining her protected personal information from information originating from state motor vehicle records without her consent in order to surprise, harass, threaten and intimidate her with bills for parking she never agreed to pay.

97.     In or around November of 2022, Ms. Nelson went to the UPS store

20

located at 1116 20th St. S, Birmingham, AL 35205. She parked in the parking lot behind the building with the UPS store. Ms. Nelson previously frequented this location many times, and she always parked in the lot behind the store while she handled her business in UPS. For years, UPS had several designated free parking spots in the lot.

98.    On the occasion at issue here, Ms. Nelson did not realize that MPS or one of its Partners were now managing the parking lot behind UPS, and she parked in the same spots that she always had. Ms. Nelson did not see any signage, barriers, or parking attendants to indicate that it had become a paid lot.

99.    Ms. Nelson was in the UPS store approximately 35 minutes, returned to her vehicle, and left the parking lot. She went on with her life.

100.   Weeks later, she received a letter entitled "Parking Invoice" from MPS that was mailed to her home address and claimed that she owed $10 for Unpaid Parking Fee in the lot behind UPS plus a "Ticket Amount" of $105, which is a miscellaneous and unidentified fee that is 1050% higher than the Unpaid Parking Fee.[5]

101.   MPS's Ticket or letter threatens that the amount due to MPS would increase in a few weeks and that MPS would refer her to collections or that her vehicle would be subject to booting/towing if she failed to pay within 60 days.

---

[5] MPS's Ticket Number sent to Ms. Nelson is MPS-8107723.

102. The letter MPS and/or its agents mailed to her home address included her name, home address, license plate number, the make of the motor vehicle, identified the parking lot as the location upon which she incurred the parking fine, and included a picture of the rear of her motor vehicle taken at the entrance of the parking lot that clearly displayed her license plate and license plate number.

103. Ms. Nelson thought there must have been a mistake, so she called MPS. MPS confirmed that it sent her the "invoice" based on the information it had gathered from its cameras.

104. Despite a request from Ms. Nelson, MPS refused to void or reduce the invoice.

105. Fearing damage to her credit score or the other consequences that MPS had threatened, Ms. Nelson sent a check to MPS for $115 on December 13, 2022.

106. Ms. Nelson neither provided Defendant with the personal information needed to identify her by name and address nor consented to Defendant accessing or obtaining her DMV records.

107. MPS's conduct towards Ms. Nelson was an intrusion upon her seclusion and an invasion of her privacy, and it caused her to experience distress, aggravation, and annoyance.

108. Defendant harassed and invaded Plaintiff's privacy and solitude by obtaining, disclosing, and using Plaintiff's personal and private motor vehicle record

information.

109.    Defendant harassed and invaded Plaintiff's privacy and solitude by disclosing Plaintiff's personal and private motor vehicle record information to Defendant's vendor(s) and/or agent(s).

110.    Defendant's conduct and DPPA violation caused Plaintiff and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, invasion of their privacy, and intrusion upon seclusion in a space that is personal and private to Plaintiff and the Class Members.

***Plaintiff Christopher Williams***

111.    Mr. Williams is a victim of Defendant' scheme. MPS and its agents unlawfully identified him by obtaining his protected personal information from information originating from state motor vehicle records without her consent in order to surprise, harass, threaten and intimidate him with a bill for parking he never agreed to pay.

112.    On June 25, 2022, Mr. Williams was traveling through Birmingham. He decided to stop to eat at The Original Pancake House located at 1116 20th St. S, Birmingham, AL 35205.

113.    Before arriving, he called the restaurant to ask about parking. The restaurant's automated voice recording informed him that there was a free parking lot directly behind the building.

23

114.    Mr. Williams arrived at the restaurant and parked in the lot behind the building as instructed.

115.    He ate, returned to his car, and left.

116.    Weeks later, Mr. Williams received a letter entitled "Parking Invoice" addressed from MPS that was mailed to his home address and claimed that he owed $75 for parking in the lot behind The Original Pancake House.[6]

117.    The Ticket claimed that he owed $10 for Unpaid Parking Fee in the lot plus a "Ticket Amount" of $65, which is a miscellaneous and unidentified fee that is 650% higher than the unpaid parking fee.[7]

118.    MPS's Ticket or letter threatens that the total amount due to MPS would increase in a few weeks (presumably a penalty for failing to timely pay the "Ticket Amount," not the Unpaid Parking Fee) and that MPS would refer him to collections or that his vehicle would be subject to booting/towing if he failed to pay within 60 days.

119.    The letter mailed to his home address included his name, home address, license plate number, the make of the motor vehicle, identified the parking lot as the location upon which he incurred the parking fine, and included a picture of the rear of his motor vehicle taken at the entrance of the parking lot that clearly

---

[6] MPS's Ticket Number sent to Mr. Williams is MPS-7484474.

displayed his license plate and license plate number.

120. Mr. Williams then had to spend time appealing the ticket, explaining that the restaurant had assured him the lot was free to park for its customers.

121. Ultimately, MPS or one of its Partners agreed that it should not have sent him the invoice and voided it out.

122. Mr. Williams neither provided MPS or its agents with the personal information needed to identify him by name and address nor consented to Defendant or its agents accessing or obtaining his personal information from DMV records.

123. MPS's conduct towards Mr. Williams was an intrusion upon his seclusion and an invasion of his privacy, and it caused him to experience distress, aggravation, and annoyance.

124. Defendant harassed and invaded Plaintiff's privacy and solitude by obtaining, disclosing, and using Plaintiff's personal and private motor vehicle record information.

125. Defendant harassed and invaded Plaintiff's privacy and solitude by disclosing Plaintiff's personal and private motor vehicle record information to Defendant's vendor(s) and/or agent(s).

126. Defendant's conduct and DPPA violation caused Plaintiff and the Class Members harm, including violations of their statutory privacy rights, harassment, annoyance, nuisance, invasion of their privacy, and intrusion upon

25

seclusion in a space that is personal and private to Plaintiff and the Class Members.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs brings this nationwide class action on behalf of themselves

and on behalf of others similarly situated (the "Class"), defined as follows:

> All individuals in the United States who, during the four years prior to the filing of this lawsuit through the date of class certification, (1) had their vehicle's license plate information captured by MPS's automated license plate reader technology; (2) had their license plate information provided by MPS to GovCIO, LLC; (3) had their license plate information matched with their home address and name by GovCIO, LLC; and (4) were mailed one or more parking violation notices to their residences demanding payment.

Excluded from the Class are Defendant, its agents, affiliates, parents,

subsidiaries, any entity in which Defendant has a controlling interest, any Defendant

officer or director, any successor or assign, and any Judge who adjudicates this case,

including their staff and immediate family.

128.    Plaintiffs reserve the right to amend the class definition.

129.    This action satisfies the numerosity, commonality, typicality, and

adequacy requirements under Fed. R. Civ. P. 23.

130.    **<u>Numerosity</u>**. Plaintiffs are representative of the proposed Class,

consisting of hundreds, if not thousands, of individuals whose motor vehicle records

were improperly accessed and obtained by Defendant and its agents, far too many to

join in a single action.

131. **Commonality**. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. For example:

    a. whether Defendant and its agents collected Plaintiffs' and the Class's personal information;

    b. Whether Defendant and its agents collected Plaintiffs' and the Class's personal information from a motor vehicle record without express or written consent or authorization;

    c. whether Defendant and its agents unlawfully obtained, disclosed, and/or used Plaintiffs' and the Class's personal information in violation of the DPPA;

    d. whether Plaintiffs' and Class Members provided Defendant and its agents with express or written consent or authorization to obtain and use their personal information from state motor vehicle records;

    e. whether the systematic and routine violations of the DPPA by Defendant and its agents were committed willfully or with reckless disregard for the law;

    f. the nature and extent of all statutory penalties or damages for which Defendant is liable to Plaintiffs and Class Members, and;

    g. Whether punitive damages are appropriate.

132.    **<u>Typicality</u>**. Plaintiffs' claims are typical of those of the Class because Plaintiffs—like all members of the Class—had their personal information from motor vehicle records, maintained by a State Motor Vehicle Department, obtained, used, redisclosed and/or resold by Defendant and its agents for purposes not permitted by the DPPA.

133.    **<u>Adequacy</u>**. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

134.    **<u>Superiority</u>**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds or thousands of individual actions would require. Class action treatment will permit the

adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

135. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

136. The litigation of the claims brought herein is manageable. Defendant and its agents' uniform conduct, uniform methods of data access and collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems

with prosecuting this lawsuit as a class action.

137.   Adequate notice can be given to Class Members directly using information maintained in the records of Defendant and its agents.

**COUNT I**
**Violations of the Driver's Protection Privacy Act**
**18 U.S.C. § 2721, *et seq.***

138.   Plaintiffs incorporates and realleges the above factual allegations by reference.

139.   The Driver's Privacy Protection Act, 18 U.S.C. § 2721(a), *et seq.*, prohibits a person or organization from knowingly obtaining, disclosing, or using personal information contained in motor vehicle records for any purpose not specifically permitted under 18 U.S.C. § 2721(b).

140.   Defendant, either directly or by and through its agents, violated and continues to violate 18 U.S.C. §2721, *et seq.*, by intentionally obtaining, using, and disclosing Plaintiffs and Class Members' motor vehicle records without their knowledge, consent, or authorization for purposes not specifically permitted under the DPPA.

141.   Plaintiffs and Class Members are individuals within the meaning of 18 U.S.C. §2725(2).

142.   The names, addresses, telephone numbers, and other information that Defendant obtained from motor vehicle records pertaining to Plaintiffs and Class

Members was "personal information" as defined under 18 U.S.C. §2725(3).

143. The contents of Plaintiffs' and Class Members' records obtained by Defendant constitute a "motor vehicle record," because they contain records that "pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles," within the meaning of 18 U.S.C. §2725(1).

144. Defendant and its agents were not authorized recipients under 18 U.S.C. § 2721(c).

145. Defendant and its agents knowingly used the personal information obtained from the DMV motor vehicle records to mail letters to Plaintiffs' and Class Members' addresses.

146. Defendant did not obtain express consent or authorization from Plaintiffs or Class Members to obtain their personal information from the DMV or use their information for this purpose.

147. As a direct and proximate result of the aforesaid acts and activities of Defendant and its agents, Plaintiffs and Class Members have sustained harm including but not necessarily limited to, intrusions upon their seclusion, invasions of their privacy, the time wasted reviewing defendant's collection letters, disputing the invoices, and/or remitting payment to Defendant, which caused each to experience distress, aggravation, and annoyance.

148.   As provided by the DPPA, Plaintiffs and the Class Members seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with DPPA's requirements; (iii) statutory damages of $2,500 for each violation of the DPPA pursuant to 18 U.S.C. § 2724(a) and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all those similarly situated, demand a jury trial on all claims so triable and request that the Court enter an order:

a.   Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

b.   Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

c.   Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

d.   For a declaration that Defendant's actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendant's violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class;

e.   For an order awarding injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendant from engaging in the acts alleged above; (ii) requiring Defendant to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) awarding Plaintiffs and Class Members full

32

restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged herein; and, (iv) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendant;

f.    For an award to Plaintiffs and the Class of their costs and expenses of this litigation;

g.    For an award to Plaintiffs and the Class for their reasonable attorneys' fees;

h.    An award to Class Members of damages, including but not limited to: statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

i.    For pre-and post-judgment interest as allowed by law, and;

j.    For such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 27, 2024                Respectfully submitted,

/s/ Manuel S. Hiraldo
Manuel S. Hiraldo
Florida Bar No. 030380
Hiraldo P.A.
401 E. Las Olas Boulevard, Suite 1400
Ft. Lauderdale, Florida 33301
Tel: 954.400.4713
E: mhiraldo@hiraldolaw.com

/s/ Rachel Dapeer
Rachel Dapeer
Florida Bar No. 108039
**DAPEER LAW P.A.**
20900 NE 30th Ave., Suite 417

33

Aventura, FL 33180
Tel: 305-610-5223
E: rachel@dapeer.com

*/s/ Jon Mann*
Jonathan S. Mann (Admitted *PHV*)
Austin B. Whitten (Admitted *PHV*)
**PITTMAN, DUTTON, HELLUMS,
BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
E: jonm@pittmandutton.com
E: austinw@pittmandutton.com

*Attorneys for Plaintiffs Smiley, Nelson,
Williams, and Interim Class Counsel for the
Putative Class*

34

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will provide notification to all counsel of record.

/s/ Jon Mann
Jonathan S. Mann

# EXHIBIT A

# PARKING TICKET

THIS INVOICE IS PRIVATELY
ISSUED AND IS NOT AFFILIATED
WITH THE CITY OF PENSACOLA



000430 1 1 1 ***************AUTO**MIXED AADC 956

▓

ᴵᴸᴵᴵᴵᵘᴵᵘᴵᵗᴵᵗ'ᴵᵗᵘᵘ'ᴵᵘᵗᵘᵗᴵᴵᴵᵘᴵᵘᴵᵗᵘᴵ'ᵗᵘᴵᵗᴵᵘᴵᴵᵘᴵᴵᴵ

| | |
|---|---|
| AMOUNT DUE | $89.00 |
| TICKET AMOUNT | $65.00 |
| UNPAID PARKING FEE | $24.00 |
| TICKET NUMBER | 10249622 |
| PLATE | ■■■■■ |

— ✂ — — — Cut here and include top half in envelope if paying by check — — — ✂ — —

## Pay by due date to avoid additional penalties

### Fee schedule

### TO PAY ONLINE OR APPEAL
enforcement-web.premiumparking.com

### PAY BY CHECK
Municipal Parking Services
PO Box 56638
New Orleans, LA 70156

| | |
|---|---|
| Pay before 2024-02-25 | $89.00 |
| Pay before 2024-03-26 | $129.00 |

TICKETS NOT PAID AFTER 60 DAYS WILL BE REFERRED TO COLLECTIONS. VIOLATOR'S VEHICLES ARE
SUBJECT TO BOOTING/TOWING.



| | |
|---|---|
| Lot/Garage # | P2831 |
| Address | 180 E Romana Street, Pensacola |
| Offense | non-permit |
| Total payment made | $0.00 |
| Time purchased | 0 |
| Time of violation | 2024-01-26 06:40 pm |
| Entry recorded at | 06:10:34 pm |
| Exit recorded at | 11:25:02 pm |
| Total time parked | 05:14:28 |
| Notification generated | 2024-01-30 |



2831-Exit  01/26/2024 11:25:02 PM CST



P2831-Entry  01/26/2024 06:10:34 PM CST

## PARKING TICKET



THIS INVOICE IS PRIVATELY
ISSUED AND IS NOT AFFILIATED
WITH THE CITY OF PENSACOLA


********AUTO**MIXED AADC 956

| AMOUNT DUE | $89.00 |
|---|---|
| TICKET AMOUNT | $65.00 |
| UNPAID PARKING FEE | $24.00 |
| TICKET NUMBER | 10278470 |
| PLATE | ▮▮▮▮ |

— — ⊁ — — — Cut here and include top half in envelope if paying by check — — — — ⊁ — — —

Pay by due date to avoid additional penalties

**TO PAY ONLINE OR APPEAL**
enforcement-web.premiumparking.com

**PAY BY CHECK**
Municipal Parking Services
PO Box 56638
New Orleans, LA 70156

Fee schedule

| Pay before 2024-03-03 | $89.00 |
|---|---|
| Pay before 2024-04-02 | $129.00 |

TICKETS NOT PAID AFTER 60 DAYS WILL BE REFERRED TO COLLECTIONS. VIOLATOR'S VEHICLES ARE
SUBJECT TO BOOTING/TOWING.



| Lot/Garage # | P2831 |
|---|---|
| Address | 180 E Romana Street, Pensacola |
| Offense | non-permit |
| Total payment made | $0.00 |
| Time purchased | 0 |
| Time of violation | 2024-02-02 07:51 pm |
| Entry recorded at | 07:21:56 pm |
| Exit recorded at | 07:56:11 pm |
| Total time parked | 00:34:15 |
| Notification generated | 2024-02-07 |



Exit  02/02/2024 07:56:11 PM CST



P2831–Entry  02/02/2024 07:21:56 PM CST

# PARKING TICKET

THIS INVOICE IS PRIVATELY
ISSUED AND IS NOT AFFILIATED
WITH THE CITY OF PENSACOLA

000848 1 2 2 ***************AUTO**MIXED AADC 956

| AMOUNT DUE | $89.00 |
| --- | --- |
| TICKET AMOUNT | $65.00 |
| UNPAID PARKING FEE | $24.00 |
| TICKET NUMBER | 10260751 |
| PLATE | |

— — — — ✂ — — — — Cut here and include top half in envelope if paying by check — — — — ✂ — — — —

Pay by due date to avoid additional penalties

### TO PAY ONLINE OR APPEAL
nforcement-web.premiumparking.com

### PAY BY CHECK
Municipal Parking Services
PO Box 56638
New Orleans, LA 70156

### Fee schedule

| Pay before 2024-02-27 | $89.00 |
| --- | --- |
| Pay before 2024-03-28 | $129.00 |

TICKETS NOT PAID AFTER 60 DAYS WILL BE REFERRED TO COLLECTIONS. VIOLATOR'S VEHICLES ARE
SUBJECT TO BOOTING/TOWING.



| Lot/Garage # | P2831 |
| --- | --- |
| Address | 180 E Romana Street, Pensacola |
| Offense | non-permit |
| Total payment made | $0.00 |
| Time purchased | 0 |
| Time of violation | 2024-01-28 05:40 pm |
| Entry recorded at | 05:10:49 pm |
| Exit recorded at | 10:31:11 pm |
| Total time parked | 05:20:22 |
| Notification generated | 2024-02-01 |



01/28/2024 10:31:11 PM CST



P2831-Entry   01/28/2024 05:10:49 PM CST

# EXHIBIT B

Come meet us at the Georgia Chiefs of Police Conference in Savannah July 21st & 22nd. Booth 1302

Case 3:24-cv-00320-TKW-HTC   Document 23   Filed 09/27/24   Page 41 of 42

# MPS
Intelligent Infrastructure

Home   Solutions   Markets   Media   About Us   English ⌄

Get Started

**SOLUTIONS**

## Lots & Garages
Automated LPR Cameras

The MPS solution provides automated, cost-effective parking lot & garage management solutions for businesses across the United States.

**Request a Demo**

⌄

## Features Include

The patented MPS technology can increase your parking revenue, improve parking behavior, and streamline reporting in one comprehensive platform.

Remote Management                                            ⌄

Automated Enforcement                                        ⌃





MPS provides an easy to use interface that allows you to quickly and easily manage your parking lots.

Violation logs are generated and stored for analysis, enforcing proper payment and securing the facility.

When a vehicle exits the lot without paying or overstays the expiration time on their payment, parking violations can be executed and processed.

MPS can also perform DMV look ups and automatically notify a towing service if necessary.

Permit Management

Our Solution is Simple

MPS Gateless & Open Lot Solutions

